# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WEST VIEW RESEARCH, LLC, | : |
| Plaintiff, | : |
| v. | : C.A. No. 18-211-LPS |
| BMW OF NORTH AMERICA, LLC and BMW MANUFACTURING CO., LLC, | : |
| Defendants. | : |

Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, DE

Adam Garson, Frederic G. Ludwig, III, GAZDZINSKI & ASSOCIATES, PC, San Diego, CA

    Attorneys for Plaintiffs


Brian A. Biggs, Denise Seastone Kraft, DLA PIPER, Wilmington, DE

David R. Knudson, DLA PIPER, San Diego, C.A.

Joseph Lavelle, Andrew N. Stein, Joshua Kresh, DLA PIPER, Washington, D.C.

    Attorneys for Defendants

## MEMORANDUM OPINION

March 5, 2019
Wilmington, Delaware

STARK, U.S. District Judge:

Plaintiff West View Research, LLC ("Plaintiff") filed suit against Defendants BMW of North America, LLC and BMW Manufacturing Co., LLC (collectively, "Defendants") on October 17, 2016, alleging infringement of U.S. Patent No. 9,299,053 (the "'053 Patent"). (D.I. 1) The patent-in-suit relates to the provision of certain services, including the delivery of chattels, generally directed to some mobile device.

Presently before the Court is the issue of claim construction. The parties completed briefing on November 9, 2018. (D.I. 96, 99, 103, 106) The Court held a claim construction hearing on December 3, 2018. (*See* D.I. 111) ("Tr.")

## I. LEGAL STANDARDS

### A. CLAIM CONSTRUCTION

The ultimate question of the proper construction of a patent is a question of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91 (1996)). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation and internal quotation marks omitted). "[T]here is no magic formula or catechism for conducting claim construction." *Id.* at 1324. Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321

1

(internal quotation marks omitted). The patent "specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . . [b]ecause claim terms are normally used consistently throughout the patent." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)) (alteration in original) (internal quotation marks omitted).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

"In some cases, . . . the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is

unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (quoting *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996)).

## B. INDEFINITENESS

A patent claim is indefinite if, "viewed in light of the specification and prosecution history, [it fails to] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). A claim may be indefinite if the patent does not convey with reasonable certainty how to measure a claimed feature. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015). But "[i]f such an understanding of how to measure the claimed [feature] was within the scope of knowledge possessed by one of ordinary skill in the art, there is no requirement for the specification to identify a particular measurement technique." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1319 (Fed. Cir. 2015).

4

## II. CONSTRUCTION OF DISPUTED TERMS[1]

### A. "obtain the one or more chattels in substantially automated fashion and without having to specifically enter address data"[2]

| Plaintiff |
|---|
| obtain delivery or possession of one or more chattels without having to manually type or enter address data into a user interface of a computerized device |
| **Defendants** |
| Indefinite |
| **Court** |
| obtain the one or more chattels by requiring the user to do no more than: (i) authenticate him/herself as a user, (ii) perform such incidental acts necessary to have information entered automatically into a computerized device, and/or (iii) confirm any relevant information necessary for the delivery of the chattel |

The parties dispute whether the term "substantially automated" renders the claim indefinite. Plaintiff notes that the term is found only in the claim's preamble, and that subsequent claim limitations set forth a series of (mostly) automated steps that together define "substantially automated." (D.I. 96 at 2-3) Defendants counter that the claim sets forth no bounds as to how much a user may be required to do before the process is no longer "substantially automated." (D.I. 99 at 7-8) ("Can competitors require entry of all this information 'by hand' to avoid the 'substantially automated' limitation and hence not infringe? Is manually entering half the data, or manually validating the data entered automatically outside the claim?").

---

[1]The Court will also adopt the parties' agreed-upon constructions. With respect to certain terms, the parties appear to disagree as to which claims are in dispute. As the Court has found that in some such instances Plaintiff has misidentified claims (*see, e.g.*, D.I. 96 at 16 (misidentifying claim 127), 20 (same for claims 145 and 146)), the Court has limited its analysis to those claims identified by Defendants. The constructions provided in the Court's Opinion and Order are limited (at this point) to those claims expressly identified herein.

[2]This term appears in claim 124 of the '053 Patent.

5

At oral argument, Plaintiff agreed that "substantially automated" does not equate to "without having to specifically enter address data," as that limitation is provided for explicitly (and distinctly from "substantially automated"). (Tr. at 8)

Turning to the specification, it becomes clear that "substantially automated" means a user may obtain the one or more chattels by authenticating him/herself as a user, and may optionally perform a few relatively simple tasks (including confirming information) necessary to initiate the delivery, as long as all other steps are performed automatically by a computer system or by a third party.

The specification states that "[t]he transfer of information to the client device may be fully automated, conditional upon assent from the user, or fully manual as desired." '053 Patent, col. 14 ll. 62-64. Conditioning an automated delivery on "assent from the user" brings the process out of the realm of "fully automated" to "substantially automated." The specification also discusses how a user may retrieve a chattel by approaching a kiosk and authenticating him/herself as a user and confirming relevant information. This may be done, for example, by username/password, *id.* at col. 15 ll. 4-8 ("The window or applet includes a user name/password feature, wherein the distant user may instruct their client software to initiate certain algorithms or actions, such as transmission of personal information."), an RFID device (that "automatically provide[s] the kiosk/module 110 with the user's information"), or a USB key (that may be plugged into the kiosk, whereupon the user can "confirm or cancel" the shipping/retrieval of the chattel), *id.* at col. 16 ll. 10-22. However, the substance of the information that may be provided by the user (e.g, names, addresses, credit card information) is not entered manually. *Id.* at col. 14 ll. 30-36 ("In use, the user manually or automatically establishes a connection . . . thereby allowing for transfer of data relevant to the impending transaction, such as the user's home

6

address, credit card payment information, etc. . . . [obviating] the user having to [] stand at the kiosk and manually enter the information."); col. 19 ll. 55-64 (discussing that user may swipe credit card to initiate payment).

This is the understanding a person of ordinary skill in the art would have as to the scope of the claims, with reasonable certainty. (*See* D.I. 98 at ¶¶ 21-23, 26) Defendants have failed to prove the contrary by clear and convincing evidence.

### B. "location-based service"[3]

| |
|---|
| **Plaintiff** |
| a service whose performance is at least in part specific to or predicated on a location of, or specified by, a recipient of the service |
| **Defendants** |
| Indefinite |
| **Court** |
| a service whose performance is at least in part specific to or predicated on a location of, or specified by, a recipient of the service |

Plaintiff argues that even if this term is not defined in the specification, it is a well-known term of art and the inventors did not seek to redefine it. (D.I. 96 at 7-8) Defendants contend that it is indefinite. (D.I. 99 at 9-10) The Court concludes that the specification and claims meaningfully distinguish between location-based and non-location-based services, especially in relation to mobile devices, and Defendants have failed to prove that the term is indefinite.

Although the specification never uses the term "location-based service," the specification does provide one example of a user selecting a location to which a chattel would be delivered. '053 Patent, col. 15 ll. 48-56. Turning to the claims, independent claim 141 recites that "a first service" may be provided to the user of a "mobile computerized electronic apparatus." *Id.* at col.

---

[3]This term appears in claims 142, 143, and 180 of the '053 Patent. However, of these three, Defendants contend only that claim 142 is indefinite.

7

49 ll. 31-33. Dependent claim 142, which depends from claim 141, introduces the disputed term by claiming "the first service comprises a location-based service." *Id.* at col. 50 ll. 10-12.

Claim 143 depends from claim 142 and defines the "location-based service" as "***delivery of data*** useful to the user at the location." '053 Patent, col. 50 ll. 13-15 (emphasis added). Likewise, claim 144 defines "the first service" (defined as a "location-based service" in interceding claim 142) as "***streaming of data*** via the cellular wireless interface . . . the streamed data comprising music data." '053 Patent, col. 50 ll. 22-24 (emphasis added). These dependent claims support the conclusion that "location-based services" require the provision of some service to be tied, at least in part, to a remote source, which is then delivered to the user at a particular location distinct from the source.

This is the understanding a person of ordinary skill in the art would have as to the scope of the claims, with reasonable certainty. (*See* D.I. 98 at ¶¶ 33-36) Defendants have failed to prove the contrary by clear and convincing evidence.

### C. "mobile computerized electronic apparatus"[4]

| |
|---|
| **Plaintiff** |
| a computerized apparatus which is designed to be portable; *i.e.*, can be readily moved from one location to another, and which may be part of a larger or host apparatus which can also be readily moved from one location to another |
| **Defendants** |
| a personal computer, personal digital assistant, or cell phone used to communicate with a kiosk where chattels are deposited or to a processing entity associated with the chattel delivery service |
| **Court** |
| a computerized apparatus which is designed to be portable, or is affixed to or part of another object designed to be readily movable (e.g., a vehicle) |

The parties dispute whether the term should be limited to personal computers, PDAs, and cellphones, and whether it should be limited to mobile apparatuses or applications used to

---

[4]This term appears in claims 141, 143, and 180 of the '053 Patent.

communicate with a kiosk. (Tr. at 28-29) The Court concludes that none of these restrictions is supported. The specification explicitly states that its enumerated examples of mobile electronic devices are ***nonlimiting***, and distinguishes a mobile apparatus from a traditionally "fixed" device such as a "desktop computer." '053 Patent, col. 12 ll. 24-29 ("e.g. cellular telephones, PDAs, notebook computers, remote monitoring stations, ***and the like***") (emphasis added). Nor is there support for limiting the term to use with kiosks. In fact, the specification envisions "wireless and instant connections between various communications devices." *Id.* at col. 12 ll. 24-26.

Further, the Court clarifies that a mobile computerized electronic apparatus may be a computerized apparatus (not necessarily itself "designed to be portable") that is part of or affixed to another object designed to be readily movable. '053 Patent, col. 22 ll. 27-29 (noting that device may be considered "mobile" if affixed to another movable object such as vehicle).

### D. "first radio frequency interface means"[5]

| **Plaintiff**<br>Means-plus-function<br><br>Function: To exchange data with a portable radio frequency device carried by the user when the portable radio frequency device is within communications range of the first radio frequency interface means<br><br>Structure: (1) Portions of the (stationary or mobile) host; (2) The reader antenna(s) which emits and receives radio frequency signals during interrogation; and (3) Computer software which controls and performs the reader interrogation protocols and security protocols |
|---|
| **Defendants**<br>Not means-plus-function<br><br>an RFID interface including an interrogator to interrogate portable RFID devices in range of the interrogator |

---

[5]This term appears in claim 180 of the'053 Patent.

9

> **Court**
> Means-plus-function
>
> Function: To exchange data with a portable radio frequency device carried by the user when the portable radio frequency device is within communications range of the first radio frequency interface means
>
> Structure: an antenna, an RFID reader/sensor, and RFID tags

Pursuant to 35 U.S.C. § 112, ¶ 6, a claim limitation may be recited in terms of a particular function to be performed, rather than the structure, material, or acts for performing that function. Generally, "the use of the word 'means' in a claim element creates a rebuttable presumption that § 112, [¶] 6 applies." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). Where the patentees avail themselves of this means-plus-function claiming technique, the claim element "shall be construed to cover the corresponding structure . . . described in the specification and equivalents thereof." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1257 (Fed. Cir. 1999). However, this presumption may be rebutted "if the claim itself recites sufficient structure to perform the claimed function." *Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1364 (Fed. Cir. 2000); *see also Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427-28 (Fed. Cir. 1997) ("[W]here a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format."). Further, if there "is no structure in the specification corresponding to the means-plus-function limitation in the claims, the claim will be found invalid as indefinite." *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007).

In this case, the "interface means" invokes 35 U.S.C. § 112, ¶ 6 because the limitation is described by its function, albeit indirectly, and does not disclose sufficient structure to perform that function. The entire claim limitation reads: "a first radio frequency interface means *in data*

10

*communication* with the means for digital data processing and the at least one computer program . . . [wherein] at least one computer program further configured to *cause* the first radio frequency interface means to exchange data with a portable radio frequency device carried by the user when the portable radio frequency device is within communication range of the first radio frequency interface means." '053 Patent, col. 57 ll. 10-20 (emphasis added).

The claim does not recite sufficient structure to overcome the presumption of a means-plus-function limitation. *See Envirco,* 209 F.3d at 1364. The final clause of the claim reads: "the first radio frequency interface means comprises *a radio frequency ID (RFID)-based radio frequency interface* comprising an *interrogator apparatus* capable of interrogating the portable radio frequency device when the . . . device is within the communications range." '053 Patent, col. 58 ll. 55-60 (emphasis added); *see also* D.I. 96 at 14 n.13 (Plaintiff arguing "interrogator apparatus" is a non-structural generic placeholder). Whether looking at the "RFID-based radio frequency interface" or "interrogator apparatus," the Court's conclusion is the same: the claims do not teach sufficient structure to accomplish the recited function. *See TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259-60 (Fed. Cir. 2008) ("Sufficient structure exists when the claim language specifies the exact structure that performs the function in question without need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure."). Both "RFID-based radio frequency interface" and "interrogator apparatus" are generic descriptors. An RFID "interface" implies an intermediary of exchange, but says little to nothing about what structures accomplish the function of "exchanging data," and may be likened to the well-known nonce word "module." *Williamson,* 792 F.3d at 1350. Likewise, while an "interrogator" is a known term associated with RFID systems, it, too, lacks structure on its own. *See* '053 Patent, col. 58 ll. 57-60 ("an apparatus for interrogating," "capable of

11

interrogating the [device]"); *see also Massachusetts Inst. of Tech. & Elecs. For Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006) ("The generic terms 'mechanism,' 'means,' 'element,' and 'device,' typically do not connote sufficiently definite structure."); *see generally* M.P.E.P. § 2181 ("The following is a list of nonstructural generic placeholders that may invoke . . . 35 U.S.C. [§] 112, paragraph 6: 'mechanism for,' 'module for,' 'device for,' 'unit for,' 'component for,' 'element for,' 'member for,' 'apparatus for,' 'machine for,' or 'system for.'").

The Court must look to the specification to see what structure is associated with the "interface means." *Micro Chem.*, 194 F.3d at 1257. Plaintiff asserts that the "interface means" performs multiple functions, such as (i) broadcasting a signal and receiving the backscatter; (ii) processing data; (iii) formatting data; and (iv) sending it to the processor. (Tr. at 34-35) But this captures more than the claimed function and more than is taught in the specification. The only structure that needs to be included in the Court's construction is that which is necessary to achieve the recited function of exchanging data when the interface means and radio frequency device are within a communication range. For this function, "to exchange data," the specification discloses a system utilizing an antenna, an RFID sensor/reader, and RFID tags. '053 Patent, col. 6 ll. 8-16; col. 6 l. 63-col. 7 l. 46; col. 8 ll. 3-21.

E. **"an electronic network proxy agent comprising a network server"**[6]

| **Plaintiff** |
|---|
| a network-based computerized system having at least one server which acts an electronic proxy or intermediary of one or more entities as part of electronic messaging or communication |
| **Defendants** |
| a software process that acts as an intermediary |

---

[6]This term appears in claim 124 of the '053 Patent.

| Court |
|---|
| a network-based computerized system having at least one server which acts an electronic proxy or intermediary of one or more entities as part of electronic messaging or communication |

Although Defendants argue that Plaintiff's construction contains "surplusage," at the hearing the parties agreed that the Court may adopt that proposed construction. (Tr. at 48-49)

### F. "application computer program having been rendered in a Java-based programming language"[7]

| Plaintiff |
|---|
| a computer program designed to operate at the application layer of a device protocol stack that *has been authored or developed* using an object-oriented "Java®" environment |

| Defendants |
|---|
| a program written in the JAVA programming language to run in a Java Virtual Machine |

| Court |
|---|
| a program written in a Java-based programming language, without regard for the particular runtime environment |

Plaintiff argues that its construction is the explicit definition provided in the specification and faults Defendants' construction for ignoring the "application computer program" portion of the claim, adding that not all computer programs are applications. (D.I. 96 at 18-19) To Plaintiff, Defendants' construction is further flawed for improperly limiting any Java-based application to Java Virtual Machine ("JVM"), improperly eliminating Android-based devices that utilize other "virtual machines." (*Id.* at 19) Defendants counter that that the Court must construe the claim as it would have been understood in 2003, which would have been "a program that runs on a computer in a special software environment known as a virtual machine." (D.I. 99 at 14-15; D.I. 106 at 10) Android did not exist at the time and, in the view of Defendants, should not be considered. (D.I. 106 at 10)

---

[7]This term appears in claims 36 and 198 of the '053 Patent.

13

In the Court's view, the claim limitation is unconcerned with where and how the "application computer program" is run after its creation. The claims and specification require only that any such program "be[] ***rendered*** in a Java-based programming language." '053 Patent, col. 61 ll. 9-10 (emphasis added). The parties agreed at oral argument that "rendered" is synonymous with "written," "authored or developed." (Tr. at 50) The specification supports this interpretation, as the only discussion of a "computer program" and "application" concerns how the program is compiled. *See* '053 Patent, col. 5 ll. 4-23 (noting that "computer program . . . may be rendered in virtually any programming language or environment including, for example, . . . object-oriented environments such as . . . Java™ (including J2ME, Java Beans, etc.)," and "'application' refers generally to a unit of executable software that implements theme-based functionality . . . [and] generally runs in a predetermined environment; for example and without limitation, the unit could comprise a downloadable Java Xlet™ that runs within the JavaTV™ environment").

Nothing in the claims or specification limits the environment to a Java Virtual Machine, and Defendants have failed to show that no other environments existed at the time of the invention. *See Phillips*, 415 F.3d at 1313. Nor, however, does the Court find support for the entirety of Plaintiff's proposed construction. While Plaintiff attempts to use the patent's disclosure of "themes" to read an "application layer of a device protocol stack" into the claims, Plaintiff has provided nothing more than argument and a passing reference to VPN and Bluetooth stacks to support its assertions. (D.I. 103 at 19) Given the limited disclosure in the specification and the fact that the parties' arguments are directed at the runtime rather than rendering stage, the Court is not persuaded to include either party's limitations into the claims. Instead, the claim term will be given its plain and ordinary meaning: the application must have

been rendered (i.e., written) in a Java-based programming language, without regard for the particular runtime environment.

G. **"streaming of data via the cellular wireless interface from the remote network server or a proxy thereof, [[the streamed data comprising music data]]"**[8]

| Plaintiff |
| --- |
| Transmission of digital data representing content, from a network server or proxy computerized device and via at least a cellular wireless modem, over a period of time as part of a data communications session and at sufficient rate to render the content on the receiving mobile computerized electronic apparatus |
| **Defendants** |
| No construction necessary; plain and ordinary meaning |
| **Court** |
| No construction necessary |

Plaintiff argues that "streaming" is distinct from "downloading," citing generally to the definition of "service provider" in the specification (which mentions "data streaming"). (D.I. 96 at 20-21) Defendants note that the parties agree that any dispute as to the scope of this claim term is not material, contending on that basis that no construction is necessary. (D.I. 99 at 16) Notwithstanding that Plaintiff appears to be correct that "streaming of data" is distinct from "downloading," the Court sees no reason to construe this term.

H. **"an assisted global positioning system (A-GPS) receiver"**[9]

| Plaintiff |
| --- |
| a global positioning system (GPS) which uses assistance from a network infrastructure such as a computerized server or cellular base station in determining the location of the receiver, including indoors (where non-A-GPS receivers may be inoperable) |
| **Defendants** |
| a GPS system that augments satellite data by using a remote source of data or processing, such as a cell phone tower |

---

[8]This term appears in claim 144 of the '053 Patent.

[9]This term appears in claims 23 and 59 of the '053 Patent.

15

| Court |
|---|
| a GPS system that augments satellite data by using a remote source of data or processing, such as a cell phone tower |

The parties disagree as to the extent to which the term "assisted global positioning system" must be clarified. (D.I. 99 at 17; D.I. 103 at 21-22) Plaintiff insists that because the specification discusses indoor use, additional limitations must be read into the claim to enable such indoor use. (D.I. 96 at 22-23) Defendants argue that Plaintiff is merely attempting to narrow the claim to avoid invalidity, and propose a broader definition. (D.I. 99 at 17)

Given the near total lack of discussion in the specification, Plaintiffs' proposed limitations cannot properly be read into the claims. By contrast, Defendants' clear definition is consistent with the term's description in the specification and use throughout the claims: an A-GPS system augments (i.e., provides information in addition to) satellite data by using a remote (i.e., not from the same satellite) source of data or processing, such as a cell phone tower.

With respect to indoor use, the Qualcomm reference cited by both parties states that indoor performance may be accomplished using "CDMA network ranging data," which Defendants' construction covers via its exemplary reference to "cell phone towers." (D.I. 96 at 22 n.20)

## I. "provision by a third party of said desired service for said user at said current location"[10]

| Plaintiff |
|---|
| provision of a service at or associated with a location, including transportation of people or goods, and/or delivery of data |
| **Defendants** |
| No construction necessary; plain and ordinary meaning |
| **Court** |
| No construction necessary |

---

[10]This term appears in claim 23 of the '053 Patent.

16

The parties primarily dispute whether a "service" may include the transportation of people, or is limited to chattels. (D.I. 99 at 18; D.I. 103 at 22-23) Plaintiff is correct that, by defining "passenger" to include "human," and "transportation modality" to include "transportation for [] person[s]," the specification envisions the transportation of people as a service. *See* '053 Patent, col. 4 l. 66-col. 5 l. 3 (defining "transportation modality" as "any form of transportation for either ***person***, animals, and/or inanimate objects") (emphasis added); *see also id.* at cl. 115 ("[T]he transportation-related service comprising movement of a land-based transportation modality."). Therefore, the claim does not limit transportation services to "chattels."

The Court does not, however, adopt Plaintiff's proposed construction. Even without adopting a construction, the Court will (if asked) prevent any party from arguing that the claim is limited to transportation of "chattels" and not people. Further, the claim is clear (even without adopting Plaintiff's construction) that the desired service must be provided either at, or associated with, the user's current location.

### J. "secure communication session between at least a Java-based application computer program operative on the mobile electronic device and the electronic proxy agent"[11]

| |
|---|
| **Plaintiff** |
| a communications session between the user's "Java" application computer program and the electronic network proxy that utilizes one or more electronic security protocols |
| **Defendants** |
| *See* construction of "Java" above. Otherwise no additional construction necessary. |
| **Court** |
| a communications session utilizing some form of digital security (e.g., password protection, encryption, etc.) between at least an application computer program rendered in a Java-based programming language, operative on the mobile electronic device and the electronic (i.e., digital, non-human) proxy agent |

---

[11]This term appears in claim 124 of the '053 Patent.

Defendants contend that, beyond construing the term "Java" (discussed above), no further construction is needed. (D.I. 99 at 18) Defendants further argue that Plaintiff's construction impermissibly re-writes several aspects of the claim, such as changing: (1) "Java-based application" to "Java," without explanation; (2) "secure communication" to "utiliz[ing] one or more electronic security protocols" despite failing to define how a communication is secured; and (3) "proxy agent" to "network proxy," despite no other reference to a network in the claim. (*Id.* at 18-19) Plaintiff responds that its construction of "proxy agent" references networks, making its construction internally consistent, and that the reference to "electronic security protocols" is an attempt to distinguish between physical "lock and key" types of security. (D.I. 103 at 24-25)

The Court agrees with Defendants that the claim requires minimal construction. First, the Court reads "secure communication session" to mean "a communication session utilizing some form of digital security," which addresses Plaintiff's concerns that the term be distinguishable from a physical "lock-and-key." "Digital security" may include password protection, encryption, or any other means of preventing an unauthorized third party from readily accessing or obtaining the plain text of the communication. Second, "Java-based application computer program" is consistent with the Court's construction of "Java-based programming language," that is, "an application computer program rendered (or written) in a Java-based programming language." Finally, the term "electronic proxy agent" means "a digital, non-human proxy agent." The Court declines to read "network" into "proxy agent" – in part because other claims explicitly recite an "electronic network proxy," suggesting that the "proxy agent" in claim 124 does not require such a network. *See Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005) ("The doctrine of claim differentiation stems from the common sense notion that different words or

18

phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.") (internal quotation omitted).

### K. "proxy agent"[12]

| Plaintiff |
|---|
| a network-based software process that acts as an intermediary or proxy |
| **Defendants** |
| a software process that acts as an intermediary |
| **Court** |
| a software process that acts as an intermediary |

The parties agreed at oral argument that a "proxy agent" constitutes "a software process that acts as an intermediary." (Tr. at 77-78) For reasons the Court has just explained above, the Court will not accept Plaintiff's invitation to read "network-based" into "proxy agent" in claims (such as those where this dispute arises) that do not (unlike other claims in the same patent) expressly claim "an electronic network proxy agent." *See, e.g.*, '053 Patent, cls. 124, 200; *see also Seachange*, 413 F.3d at 1368.

### III. CONCLUSION

The Court will construe the disputed terms as explained above. An appropriate Order follows.

---

[12]This term appears in claims 124, 127, and 200 of the '053 Patent.